**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 17 2012, 8:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW G. GRANTHAM**
Bowers, Brewer, Garrett & Wiley, LLP
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CORY J. PINKERTON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 35A02-1202-CR-94 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HUNTINGTON CIRCUIT COURT
The Honorable Thomas M. Hakes, Judge
Cause No. 35C01-1005-FC-131

September 17, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Cory J. Pinkerton appeals the five-year sentence enhancement that was imposed under Indiana Code section 35-50-2-11 (the firearm enhancement statute) subsequent to his conviction for Reckless Homicide,[1] a class C felony. Specifically, Pinkerton contends that there was insufficient evidence for the jury to find that he knowingly or intentionally used a firearm in the commission of the underlying offense. Concluding that there was sufficient evidence, we affirm the judgment of the trial court.

FACTS

On the evening of May 14, 2010, Pinkerton, Donald "J.R." Barton, Jr., Derek Farmer, and Pinkerton's roommates, Ray Johnson and Jared Chapin, gathered at Pinkerton's residence as the close friends often did. Around 9:00 p.m., they began drinking shots of spiced rum. When they finished the first half-gallon of rum, Pinkerton and Farmer left the residence and purchased a second half-gallon. When they returned, the group continued to take shots.

Sometime earlier in the day, Barton, who had been regularly staying at the home except when he exercised parenting time, asked Pinkerton to promise "not to let him leave no matter what happened." Tr. p. 625. Barton was going through a divorce at the time, and he had become increasingly agitated throughout the day about conversations he had been having on Facebook. Later that evening while Barton, Pinkerton, Johnson, and

---

[1] Ind. Code § 35-42-1-5.

Farmer were outside on the front porch smoking cigarettes, Barton told the others they were like his brothers, and they shared a group hug.

That same night at approximately 2:30 a.m., Barton became "extremely irritated and insistent that he was going to leave and . . . go get in trouble." Id. at 626. Pinkerton and Johnson each tried to convince Barton to stay, but Barton was "completely insistent he was going." Id. Believing that he could get Barton to calm down and stay if he showed Barton that he was being "really stupid," Pinkerton went upstairs and retrieved his shotgun, which he always kept loaded, from under his bed. Id. He brought the gun downstairs, held it over his shoulder so that it was pointed away from everyone, and told Barton, "all right[,] if you're going to do something stupid and get in trouble[,] I'm going with you." Id. According to Pinkerton, the shotgun was "never supposed to be anything more than a prop." Id.

While Pinkerton was holding the shotgun over his shoulder, he and Barton continued to discuss in loud voices whether Barton should leave the home. Although their discussion was loud, they were not angry nor were any threats made. Rather, according to Chapin, the volume resulted merely from "just . . . drunk people communicating." Tr. p. 275. Chapin, who was in another room and trying to have a conversation on his cellular telephone, asked Pinkerton and Barton to be quiet so that their neighbors wouldn't call the police. When he saw Pinkerton holding the shotgun, he told Pinkerton that the gun "[didn't] need to be out" before going back to the other room and closing the door. Id. at 262.

3

Johnson also told Pinkerton that "the shotgun needed to be put up" and that neither Pinkerton nor Barton should go anywhere. Id. at 193. When Pinkerton and Barton ignored him and continued their discussion, Johnson left the home out the back door and went outside. On his way out, he asked Pinkerton to point the gun at the floor so that he could pass behind him, and Pinkerton complied.

Once Johnson was outside, Barton grabbed the barrel of the shotgun and "pulled it up towards his face." Tr. p. 627. He told Pinkerton, "I might as well just fu\*\*ing do this, it'll make everything better." Id. Pinkerton pulled the shotgun away and aimed it back toward the floor. Barton then grabbed for the barrel of the shotgun with both hands, and this time, he placed the barrel into his mouth. Farmer, who was sitting at a computer desk approximately three feet away from Barton and Pinkerton, observed Barton with control over the barrel of the gun and noted that Barton looked "almost . . . distraught." Id. at 238. Less than twenty seconds later, the gun discharged, killing Barton instantaneously.

After telling the others to leave, Pinkerton called the police. He tossed the now unloaded shotgun out onto the front porch and waited for the police to arrive. Pinkerton was arrested and read his Miranda[2] rights.

Detective Sergeant Matt Hughes of the Huntington City Police Department interviewed Pinkerton, who waived his right to have counsel present. Pinkerton explained what had happened, but he was uncertain about how the gun discharged. He

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

4

first told Detective Hughes that when Barton grabbed the gun the second time, Barton grabbed the barrel with his right hand and reached toward the stock with his left hand. Pinkerton said that in order for the shotgun to fire, the hammer needed to be pulled back and the trigger needed to be pulled. Pinkerton indicated that he had not pulled the hammer back. He told Detective Hughes that the hammer might have been pulled back by Barton when he reached for the stock and that the trigger might also have been struck by Barton at that time. Pinkerton said that "he didn't remember exactly what happened" and "that it all happened really fast and that he was really intoxicated." Tr. p. 334.

When Detective Hughes explained to Pinkerton that it seemed improbable that Barton both cocked the hammer and pulled the trigger while he was also holding the barrel of the gun up to his face, Pinkerton agreed that this version "would not be very likely." Id. at 340. Pinkerton then said it was possible that he had cocked the hammer when he was walking down the stairs with the shotgun or when he had pointed the shotgun toward the floor, but he stated he couldn't remember if he had in fact cocked the hammer or not. He stated he thought it was possible that Barton had cocked the hammer when he had grabbed the gun the second time. Regarding who pulled the trigger, Pinkerton told Detective Hughes "that he was extremely intoxicated . . . and that all the details were very fuzzy to him." Id. at 341. He also stated that "apparently what he remembered happening didn't happen." Id.

When asked whether it was likely that it was Pinkerton who caused the trigger to be pulled, Pinkerton replied, "[T]hat's probably exactly what happened." Id. at 344. And

5

when asked why he would let Barton place the loaded shotgun to his mouth a second time, Pinkerton responded "that he really didn't have a good answer for that" and "that he was very intoxicated." Id. at 345. He acknowledged that he didn't resist Barton placing the gun to his mouth the second time.

At trial, the State offered testimony from several experts, including the crime scene investigator who processed Pinkerton's residence as a crime scene, the pathologist who conducted Barton's autopsy, a forensic firearms examiner, forensic scientists from the Indiana State Police biology DNA and latent fingerprint identification units, and a bloodstain pattern interpretation expert. Through these experts, the State presented uncontroverted testimony that Barton's cause of death was "a gunshot wound to the mouth[,]" that Barton also had "burn-type injuries" to his left hand "caused by holding the barrel as the weapon was shot[,]" that the high impact blood spatter found on the top of Barton's right hand originated from the injuries to Barton's left hand, that Barton's right hand "had to be in close proximity to . . . the front of his face" at the time of discharge in order for the blood spatter to have reached his right hand, and that it would have been "impossible" for Barton's right hand to have been near the trigger when the shotgun discharged. Tr. p. 505-06, 605, 608. Moreover, the State presented evidence that the trigger of Pinkerton's shotgun required approximately seven to seven and a quarter pounds of applied pressure to fire, that the shotgun could not be characterized as having a "light trigger[,]" that there was no indication that the shotgun would fire without the hammer being at least partially cocked and the trigger pulled, and that no DNA

6

evidence or fingerprints were found on either the hammer or the trigger of the shotgun that could assist in identifying who caused the shotgun to discharge. Id. at 514.

Upon conclusion of the evidence, the jury found Pinkerton guilty of reckless homicide as a class C felony. The second phase of the trial, which concerned the firearm enhancement, was conducted immediately following the reading of the jury's verdict. No additional evidence was presented. After hearing argument from both sides, the jury determined that the State proved the firearm enhancement beyond a reasonable doubt.

On January 9, 2012, Pinkerton was sentenced to four years for the reckless homicide conviction, with the entire four-year sentence suspended to probation. Pinkerton's sentence was then enhanced by a mandatory term of five years in accordance with the firearm enhancement statute to be executed in the Indiana Department of Correction. Alleging insufficient evidence on the enhancement finding, Pinkerton now appeals.

DISCUSSION AND DECISION

Pinkerton's sole contention on appeal is that the evidence is insufficient to support the firearm enhancement. Specifically, Pinkerton claims that the evidence presented by the State was insufficient to support the jury's finding that Pinkerton "knowingly or intentionally used a firearm in the commission of [reckless homicide]" because "even the State acknowledges that [Pinkerton] did not intentionally pull the trigger." Appellant's Br. p. 4, 9.

7

In reviewing claims challenging the sufficiency of the evidence, "we neither reweigh the evidence nor judge the credibility of the witnesses." Prickett v. State, 856 N.E.2d 1203, 1206 (Ind. 2006). Rather, we consider only the evidence favorable to the judgment and any reasonable inferences that can be drawn from such evidence. Bailey v. State, 907 N.E.2d 1003, 1005 (Ind. 2009). We will affirm unless no reasonable trier of fact could find the required elements proved beyond a reasonable doubt. Cooper v. State, 940 N.E.2d 1210, 1213 (Ind. Ct. App. 2011).

The reckless homicide statute provides that "[a] person who recklessly kills another human being commits reckless homicide, a Class C felony." Ind. Code § 35-42-1-5. The firearm enhancement statute provides, in relevant part:

(a) As used in this section, "firearm" has the meaning set forth in [Indiana Code section] 35-47-1-5.

(b) As used in this section, "offense" means:

(1) A felony under [Indiana Code section] 35-42 that resulted in death or serious bodily injury. . . .

(e) If the jury . . . finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense, the court may sentence the person to an additional fixed term of imprisonment of five (5) years.

Ind. Code § 35-50-2-11.

As noted above, Pinkerton alleges that without proof that he intentionally pulled the trigger, the evidence was insufficient to prove the sentencing enhancement beyond a reasonable doubt. However, the charging information for the sentencing enhancement

8

did not allege that Pinkerton "intentionally" used a firearm; rather, it alleged that Pinkerton "<u>knowingly</u> used a firearm when he committed the offense of Reckless Homicide." Appellant's App. p. 58 (emphasis added). Moreover, this court has held that pulling the trigger to discharge a firearm is not the only way that a firearm can be "used." See <u>Daniels v. State</u>, 957 N.E.2d 1025, 1030 (Ind. Ct. App. 2011) (defining "use" of a weapon to mean "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm" and holding that the defendant's display of a gun tucked into his waistband was sufficient evidence that the defendant used the gun); <u>see also</u> <u>Nicoson v. State</u>, 938 N.E.2d 660, 665 (Ind. 2010) (discussing the "difference between possessing a firearm and using it" and concluding that the defendant used a firearm when he "discharge[d] the weapon as a warning, aim[ed] it at other human beings, and brandishe[d] it throughout the whole encounter").

In the present case, the evidence most favorable to the jury's determination is that Pinkerton, while intoxicated, retrieved the shotgun from his bedroom for the express purpose of brandishing it to cause Barton to change his mind about leaving the home. Although he was asked twice by his friends to put the gun away, Pinkerton ignored these requests and continued to display the shotgun. Even after Barton grabbed the shotgun and pulled it to his face such that Pinkerton had to pull it away, Pinkerton still did not take the shotgun back to his bedroom. In fact, Pinkerton allowed Barton to place the loaded shotgun to his mouth a second time. Finally, one of the State's experts testified that it would have been impossible for Barton to have pulled the trigger. From this

9

evidence, a reasonable trier of fact could have concluded that Pinkerton knowingly "used" the shotgun during the commission of the reckless homicide. Thus, we cannot say that the evidence was insufficient to support the firearm enhancement.

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.

10